14-1107, Peace Liberal Stadium, Illinois. Thank you for attending. I'm Margarito Feliciano. I'm going to be telling you a story. I'm going to be telling you a story. My name is Vivian Foros. My name on behalf of Nathalie is in the piece. Alright, are you both ready to proceed? You may proceed when you're ready. Good morning, Your Honors. My name again is Vicki Kuros from the State Appellate Defender's Office, arguing on behalf of Margarita Feliciano. May it please the Court and Counsel, this appeal is from a discharge hearing which resulted in a not not guilty finding. This finding, however, was against the manifest weight of the evidence because the defense met its burden of proving by clear and convincing evidence that Margarita Feliciano was insane at the time of the incidents for which she was later charged. Specifically, the evidence at the discharge hearing included, One, the observations of witnesses who described Margarita's bizarre behavior at the time of her arrest. Two, the evidence of Margarita's extensive 30-year history of mental illness, which included diagnosis of schizoaffective disorder, bipolar disorder, and probable dementia. And three, the medical testimony describing the ongoing decline of Margarita's cognitive functioning since her examination only mere months after her arrest. The medical testimony concerning her mental health, that testimony began in February, is that right? That's correct. That was one of the findings. So there's about a four-month lag time between the date of the offense and the time that this medical testimony began. That actually was, yeah, conducted. And I'll get to that as far as what that might mean. But I wanted to first address lay testimony. First of all, a court can base an insanity determination on lay testimony alone. A court does not need medical or opinion testimony to make that kind of determination. And in this case, lay testimony established that Margarita was a 68-year-old homeless woman who was just blocks away from here, on the ground, wearing her pajamas and sweatshirt, pulled up over her head, exposing, having her breasts exposed. Hidalgo, Jonathan Hidalgo, was a witness. He worked nearby and he knew a little bit about Margarita and came up to her and asked her if she was okay. She didn't respond. She just looked at him. She just stared at him. Hidalgo decided that she didn't look okay to him and that she needed help, so he called police. A couple of minutes later, three police officers arrived, who also found Margarita on the ground with her sweatshirt pulled up over her head. At some point, Margarita became agitated. She was yelling, she was cursing in Spanish at the officers to leave her alone. Officer Wiltberger testified that he didn't make any physical contact with Margarita. However, Hidalgo testified that at some point the officers did try to lift her up and move her and that her sweatshirt was only halfway on, so they tried to pull it down for her. At some point, Margarita grabbed onto Officer Wiltberger, resulting in a scratch to his arm, and she was then arrested. Again, I think what this lay testimony shows is that these witnesses were describing a woman who did not appreciate the criminality of her conduct. Also, there was a testimony of her extensive mental health history, which also included 18 hospitalizations, which dated back to the 1980s. She'd been diagnosed again with schizoaffective disorder, bipolar disorder, and probable dementia. In her history, she'd been found fit a number of times. Fit and unfit, yes. Both. But she had been found fit. At some point, yes. It's not clear what year that was or when those determinations were made, but yes, both findings were made in prior proceedings that she was subject to. Counsel, what is the standard of review here at the appellate court? The standard of review is whether the court's finding was against the manifest weight of the evidence. So the opposite conclusion is clearly evident. Exactly. Well, when you have, and I appreciate that she might not have understood the criminality as what you're saying, but didn't she put her shirt back on when the officer started coming towards her? Well, right. I mean, isn't that evidence that perhaps she did understand what she was doing wasn't correct? I think it is just as even perhaps more likely that she was feeling threatened or vulnerable. Again, she was a woman just on the street with her sweatshirt over her head, and all of a sudden three men come towards her. I think it's just as reasonable to conclude, in fact, more reasonable to conclude that she was feeling like something was going to happen to her, and that's why she made that motion. And, again, it turns out she wasn't very successful in doing so, because, again, Hidalgo says that her sweatshirt was only half on and that police tried to pull it down further from her. And, again, there was no testimony that she pulled it down once she saw the police. It wasn't until the police were actually approaching her, because, again, all the police testified that they saw her with her sweatshirt up over her head. As far as the history of her mental illness, this suggests that her chronic psychiatric difficulties plagued her for decades before this event even happened. Again, the third piece of evidence was the medical testimony, which revealed an ongoing deterioration of Margarita's emotional, physical, and cognitive functioning. Again, five months after her arrest, Margarita presented in a decompensated state. She was unkempt, unable to care for herself, confused, incoherent, showed illogical thinking, and couldn't even comprehend the simple questions that were being asked of her by the examiner. And three months later, experts continued to note Margarita's severe cognitive impairments, noting that she… But how does that all relate back to September? Because what the medical experts observed of Margarita five months later, and even later after that, were the same kind of observations that the lay witnesses saw on the day of the incident. Again, she was unkempt, she wasn't behaving properly, she seemed… she wasn't responding to questions, she seemed not okay. Again, Donald was not an expert, but we can take what he… what his observations are on face value, and that he needed to get help for her. So I'm suggesting that the observations that the lay witnesses made completely match up with what the experts were observing of her later. Is he the only lay witness? On the police officers, yes. Okay. Yes. Again, all of this evidence together clearly and convincingly established that Margarita was insane at the time of the incident, and it was against the manifest weight of the evidence for the court to conclude otherwise. And I did want to point… Did the trial court here say something to the effect of, well, nobody extrapolated that for me? Yes, and I would like to address the court's comments, because the court in making those comments also found that knowing and seeing what it did today, it would have found that Margarita was insane. But it was concerned that… the court was concerned that there was no testimony about her mental capacity at the time, and that nobody extrapolated that. That's exactly it. I think the court was laboring under the impression that it needed expert testimony to make that extrapolation. Insanity is actually a legal determination. You don't need a medical expert to make that conclusion. The court is going to make that conclusion, and, again, all the case law provides that that kind of determination can be made on lay testimony alone, which, again, makes sense, because when will you have the instance where you have the doctor present at the scene with a clipboard able to make an assessment to the defendant right there? That's not going to happen, which is why we allow witnesses to talk about what they observed the defendant's behavior was like at the time. We usually don't have an expert, though, who's basing his opinion on what the lay witnesses have observed at the time of the incident. Yes, but in this case, the expert was not comfortable making any conclusions on to or any opinions on sanity because Margarita was in such a decompensated state, so cognitively impaired, that he couldn't even have a conversation with her to figure out what her can get any information out of her to figure out what was going on with her on that day. And so the expert said, I can't even make that kind of opinion because I can't. Couldn't the expert just as easily have said, well, here's what all these lay witnesses said about her, the three police officers and Mr. Hidalgo, and based on what I'm seeing now, which is so bad, I'm going to come to that conclusion. If you're asking the judge to make that same conclusion, why couldn't the psychologist have made that conclusion? Again, I don't know what the protocols are for psychologists to make those kind of conclusions, and I don't know whether they have, again, certain protocol that they need to follow in order to do that. However, a court, we know exactly what the protocol is for a court. The court can look at the lay testimony and make a conclusion, draw a conclusion from there. The court doesn't even need that expert testimony. Is it an issue of whether the defense attorney just simply didn't ask the right questions or didn't do their correct homework? Again, my position right here is that there was enough information there for the trial court to draw the conclusions about. Again, the standard is clear and convincing evidence. I think here we have clear and convincing evidence that was highly probable that Margarita's condition in 19, or I'm sorry, 2013 was the same as it was in 2000, I believe, whenever the discharge hearing was, when the court said, if it happened today, I would find her insane. Well, you know, I think that Dwight case, and correct me if I'm wrong, I think that Dwight case basically says you really don't need this magic language like anybody. Exactly. That's true. And that there are other cases also that suggest you don't need one particular type of evidence or particular type of testimony to make an insanity determination. And it feels like, again, reading the record, it seems like that court was looking for that magic piece of evidence and not making the extrapolations necessary that the court, as a trier of fact, was responsible of making with that evidence presented to it. And as far as the court being concerned that there was no testimony of Margarita's capacity on the day of the offense, again, we have the lay witnesses talking about what her behavior was. All of this goes into what her mental capacity was. Again, they're lay witnesses. They're not going to tell you whether or not, yeah, I think she was insane or her behavior was consistent with this diagnosis. You're not going to have that. And what you do have is them describing behavior which is consistent with someone who just cannot appreciate the cronality of her actions, which should have led to an insanity finding. So what is it that you submit that we do here if we agree with your argument? That this court ought to reverse the court's finding of not guilty and instead enter a finding of not guilty by reason of insanity. And that would lead Margarita to a different set of circumstances as far as what kind of determinations happen after that as far as treatment and such. So will we have to reverse and remand or just outright reverse? I believe it's an outright reversal. But honestly, I'm not completely certain. I mean, because, again, I think you would have to go back to the court for the trial court then to set it to what happens when not guilty by reason of insanity. What happens after that. With respect to her treatment course. Right. Because then the court will not, this particular court, the court judge recalls will not be responsible for any updates on her treatment. But now it will be moved to a different court for that kind of information. This is not Judge McAllis. I'm sorry? Did you just say Judge McAllis? I believe so. No, this was Kane County's court. Oh, I'm sorry. I'm sorry. I misspoke with the Bs. That's okay. Okay. Those are good judges. Yeah, sorry. So with that, again, there was enough evidence here. And the court's comments even suggest that it should have led to the same conclusion that what I'm asking this court to get to today. And unless there are any questions, I'll reserve any more comments for rebuttal. Any questions? Okay. That'd be fine. Thank you. Thank you. Good morning, Your Honors. Good morning. Counsel, may it please the Court. Amy Diaz on behalf of the people. The issue today, as Your Honors have been discussing, is whether the trial court's ruling at the discharge hearing was against the manifest weight of the evidence. That is, whether it was arbitrary, unreasonable, or not based on the evidence presented. We will argue that it was not against the manifest weight of the evidence. But before getting into the proposed merits of defendant's arguments, I would like to address a misstatement of law in our brief. In citing two people versus Quay, we indicated in some portions of the brief that what defendant had to do in order to prevail on her request was provide evidence by a preponderance or provide, I'm sorry, meet the preponderance of the evidence standard. After Quay, the statute changed, and as counsel pointed out, it is a clear and convincing requirement now. So defendant, in order to prevail under the clear and convincing evidence requirement, that means that defendant, in order to prevail on her request at the trial court, would find that she was not guilty by reason of insanity as to the aggravated battery charge and the disorderly conduct charge she would have had to, again, provide the clear and convincing evidence. Defendant maintains that the clear and convincing evidence was provided by a few things, primarily her history of mental illness, the bizarre behavior, and the diagnoses which were presented to the court but which were made after the fact. I would like to start by addressing the history of mental illness. As I think Justice Jorgensen alluded to earlier, defendant's history of mental illness, while long, it fluctuated. In 2009, she was actually found fit to stand trial. So the fact that defendant has had a long history of mental illness does not show that she was insane on the day that she committed the conduct in question. And in order to prove legal insanity, defendant would have to show, again, by clear and convincing evidence, that she lacked the substantial capacity to appreciate the criminality of her conduct due to a mental disease or defect on the day that she committed that conduct. Well, fitness is different than insanity, correct? And it's a lower, I would say it's a lower burden. So in 2009, she was found fit. Were there other dates where she was also found fit? Your Honor, I don't recall. I know that the last one, I believe the last one was in 2009. Okay, thank you. And yes, she was hospitalized numerous times, and we do not disagree that her behavior was bizarre, but then we would submit that anybody who was charged with public indecency, disorderly conduct... Well, this is aggravated battery. Well, she was acquitted of the public indecency, but the aggravated battery and the disorderly conduct remained. Yes, her behavior was bizarre, but to say that anybody who engages in bizarre behavior is therefore insane, I mean... Well, aren't you going to, like, look at the totality of things? I mean, you're not only looking at her behavior that day. You're going to look at her prior history. You're going to look at what the experts or the treaters have said. You're going to take all of that into consideration, aren't you? Yes. And is it improper to take into consideration the testimony of a lay witness? Not at all. We agree with counsel that lay witness testimony can be enough. It was not enough in this case. The fact that Jonathan Hidalgo said that she was not okay, I think that would have been apparent to anybody. Somebody who is burying her breasts in downtown Elgin, clearly that person is not okay. Now, whether or not it rises to the level of insanity is a different question. Counsel brought up the fact that seldom would there be, or if ever, a doctor present to conduct a psychiatric evaluation when the conduct occurs. But here, if I recall correctly, when defendant was arraigned, she was released and she was allowed to go live with her boyfriend. And then approximately five months later is when the first psychiatric evaluation was conducted. The fact that the expert could not extrapolate back to the time or could not offer an opinion as to her sanity by extrapolating back to the time when the conduct occurred, I would agree that that's not necessarily dispositive of what the judge should find. But if we look at the totality of the circumstances, we have one lay witness, other than the police officer, saying she's not okay. But that was apparent. I mean, the charges would indicate that she was not okay, but she could have been drunk. He didn't smell alcohol, but she could have been on drugs. The experts could not extrapolate. All that we have is a finding five months later at best. Can the court, do you agree that the court could have taken all of that into account and done its own extrapolation? Or do you always have to have someone who comes forth and says, based on all of this, I believe, and to a medical degree of certainty, that on that date, I make these findings? Is that necessary? No, we would not propose that that's necessary. It would have been fine for the trial court to have said, based on all of this, I can extrapolate back because this is a legal standard. I believe that under different circumstances, that would have been fine. Why can't the trial court extrapolate here? Because of insufficient evidence, or that he just can't do that? Not as a bright line rule. I wouldn't say that he can't do that as a bright line rule. I think here, there was insufficient evidence. There was definitely not clear and convincing evidence, but there was insufficient evidence. And when you have, I think, the two experts testify, but only one said he could not extrapolate. All defense counsel presented was the lay witness saying she was not okay. To me, that hardly rises to clear and convincing evidence. How did the police officers describe her condition at that time on the sidewalk? I know there were three officers. I don't recall exactly how they described it. She was severely compliant. But then again, we have a lot of resisting arrest charges. I'm sorry. I'll let you answer the question. May I finish that? Okay. So I think not being compliant and exhibiting bizarre behavior, those things occur all the time. Again, that is not clear and convincing evidence of legal insanity, especially when the evidence, the strongest evidence that they're offering, was adduced at least five months later. So again, is that a failure of the system not to have her examined in a time that was closer to the event? Is she sort of a victim of circumstances here? One could argue that she's a victim of circumstances, but we don't have enough evidence in the record to show that. Well, let me put it this way. If she remained in custody, someone probably would have asked for an evaluation. Right. But I think if she had remained in custody, it's probable that somebody would have asked for an evaluation. But I think the fact that she did remain in custody shows that the jail was overcrowded, perhaps. I'm sorry? I mean, there is a multitude of reasons why she could have been released. The jail is overcrowded. They didn't want to deal with her. I mean, we have to accept the facts. Somebody let her out on bond. Somebody let her out, but the bonafide doubt wasn't raised until February. How did she end up back in custody? I believe she didn't show up to one of the court hearings and an arrest warrant was issued. Well, let me ask you this. The police never announced themselves as police officers when they approached her. Isn't that right? They didn't announce themselves as police officers, but they were in marked squad cars. They were in uniform. Right. And the medical testimony also included discussion about her eyesight and that basically she couldn't see. She had extremely progressed cataracts. Correct. So basically from her perspective, she hears three male voices, or at least two, approaching her. She doesn't know who they are, and based on the medical testimony, she can't discern, certainly can't discern any insignia. It's possible from the medical testimony, but I believe that they're in the record. I believe the MARS lights were on, but I know that they were in the marked squad cars. And I think it's important to note that when she was interacting with Jonathan Hidalgo, she did not become aggressive. But then when the officers showed up, she exhibited different behavior. And to say that she was maybe feeling awkward or feeling strange when these three men approached is really disingenuous, because she was on the street, baring her breasts while people were taking pictures, and she seemed like she was okay with that. But then when the officers approached, she changed her behavior. Jonathan Hidalgo said she wasn't okay at the same time, right? He didn't think she was okay, but whether or not she was okay with the behavior, not the behavior, I apologize, whether or not she was okay with people observing what she was doing, I think is a different question. He perceived that she was okay. So is there evidence in the record about how she felt at that time? Not how she felt. Or her perceptions? Not her perceptions, but I believe her behavior. She continued to engage in that behavior until Hidalgo called the police. But there was testimony also, I believe that Mr. Hidalgo was familiar with her. Yes. Can we conclude from that that she was also familiar with him, recognized his voice when he approached, and asked her, are you all right, she didn't become aggressive? I don't know that I would draw that conclusion. I believe that it's more possible or more probable that he was familiar with her because of her history of exhibiting. Did DHS say that she had deteriorated from 2008, from the admission in 2008? Did they testify that she had deteriorated from him? And could we take anything from that statement? Or could the trial court have taken anything from that statement? I don't recall if the deterioration was from 2008 or from after she was hospitalized in 2014. What I do recall is that she was found fit to stand trial in 2009. So the fact that she had a long history of mental illness, again, under the proper medication, she could have been fine, we could hypothesize as to a lot of things. She was fine in 2009. She was fit. But she was exhibiting certain behavior in 2013. Again, it is our belief that the evidence that was presented at the discharge hearing does not rise to clear and convincing standard. So if Your Honors have no further questions, we would ask you. Thank you very much, Your Honors. Thank you. We would ask you to reply in the judgment below. Thank you, Your Honors.  Briefly, please. Sure. I think all the case law suggests absolutely a trial court can make that extrapolation for itself. And here there was sufficient evidence to find. Again, the trial court's comments were very revealing. The trial court said, if this happened today, I would find this Margarita Feliciano insane. The same information that the trial court had about Feliciano today was very similar to the information they had about Margarita on the day of her arrest. Again, everybody agreed she was unkempt, she was disheveled, she was not responsive. She just became unnecessarily agitated when police arrived. Again, all of this suggests that she was not appreciating the criminality of her conduct at the time. And the court could have made that reasonable. Absolutely. In your position. Absolutely. There was, again, it wasn't just because she was charged with these weird offenses that this is why we're asking the court to find her insane. Again, it was everything about her interaction with everybody that came up to her that day. It was the fact that Hidalgo approached her and asked her, are you okay? She could have said, yeah, leave me alone. Again, she didn't answer. She just looked at him. There was no indication about whether or not she was even aware that these passersby were taking advantage of her situation by taking pictures or videos of her. It was Hidalgo who came out and wanted to get her some help, and that's what precipitated everything that happened here. Let me just ask you something. So she's on bond from, what, September to January or February? She was in custody, let's see, I think mid-October she was out on bond, yes. Until, let's see here, I'm not exactly sure what the timing was. But she appeared in court with an interpreter, so I'm not sure how much interaction the court had with her directly during those times or whether or not the court was addressing her, but she was addressing the interpreter who then related. Was she represented that entire time? Yes, at least by, yes, on the October date she was. And I don't have the court dates here in front of me or anything, but I would guess that she came to court once a month or once every two or three weeks or something during that time period. A couple times she did not show up in court, actually. Okay. Yeah, there were a couple times where she did not show up. There's no evidence that her attorney during any of that time when she did show up and came to court had any sort of concern about her mental health, though. Is that right? There was no indication on the record how much communication she had with her at all, so I don't know. And the motion as far as her fitness? Yes. Which file? In early February, it appears on the record, yeah. She's back in custody when? Do you know? Let's see here. Well, she's back. No, I'm not certain. I apologize. I don't know what the timing of her being in and out are. But, again, there was discussion about that she was supposed to be living with a boyfriend, but I wasn't even sure that there was even a boyfriend. I mean, again, as I recall reading the record, and I apologize that I don't have exactly when she was in and out, but I don't know how much communication the attorney had with her at that point to make any sort of determinations about whether or not, hmm, I think I'm not going to be able to work with this client and I better make my concerns known to the court. As soon as that did happen, obviously, counsel did address that fitness issue with the court. Let me see if there was any other. Again, we believe that there is sufficient evidence here for the court to have made that extrapolation about her sanity at the time of the offense. So, again, we would ask for the relief requested in the briefs. Thank you. Thank you both for your arguments. We will be in recess until the next oral at 930, and this is in due time.